**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. ___1:26-MJ-3108-LETT___

**IN RE SEALED COMPLAINT**

_____/

**CRIMINAL COVER SHEET**

FILED BY___*KAN*___D.C.

*Jun 22, 2026*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)?   No

2. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?  No

3. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024?  No

4. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024?  No

5. Did this matter involve the participation of or consultation with Magistrate Judge Yeney Hernandez during her tenure at the U.S. Attorney's Office, which concluded on April 2, 2026? No

Respectfully Submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

LORINDA LARYEA, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

By: _/s/ Jill Simon_____
Jill Simon
Trial Attorney, U.S. Department of Justice
Court ID No. A5502756
1400 New York Avenue NW
Washington, DC 20005
Tel: (202) 262-7086
E-mail: Jill.Simon@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>GIORGI KIMERIDZE | )<br>)<br>)    Case No.   1:26-MJ-3108-LETT<br>)<br>)<br>) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ April 11, 2024 _____ in the county of _____ Miami-Dade _____ in the
_____ Southern _____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to Commit Money Laundering |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

*Complainant's signature*   Badge #A1585

_____ Robert Lepley, Special Agent, HHS-OIG _____
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by   Telephone

Date:   June 22, 2026

*Judge's signature*

City and state: _____ Miami, Florida _____    HON. ENJOLIQUÉ A. LETT, U.S. MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Robert Lepley, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.      I make this affidavit in support of a criminal complaint charging Giorgi Kimeridze ("KIMERIDZE") with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h).

2.      I am a Special Agent with the United States Department of Health and Human Services, Office of Inspector General, Office of Investigations ("HHS-OIG-OI") and have been so employed since October 2015. Prior to my current position, I was a Special Agent for the Ohio Medicaid Fraud Control Unit for three years.  In my capacity as a Special Agent, I have participated in numerous investigations of criminal activity involving, among other things, health care fraud, wire fraud, and mail fraud.  During the course of these investigations, I have conducted or participated in surveillance, the execution of arrest and search warrants, debriefings of informants and other witnesses, reviews of taped conversations, analysis of financial and telephone records, and I have reviewed claims data, medical records, and other business records.  As a result of my training and experience, I am familiar with techniques and methods of operation used by individuals involved in criminal activity to facilitate various kinds of fraud and to conceal their activities from detection by law enforcement authorities.  In addition to my work experience, I have received specialized training in the field of health care fraud from the HHS-OIG-OI and others.

3.      Based on the facts set forth in this affidavit, there is probable cause to believe that KIMERIDZE has committed violations of 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering). This Affidavit is submitted in support of a criminal complaint and arrest warrant. For

the reasons set forth below, I respectfully submit that this affidavit contains probable cause to believe that between on or about April 11, 2024, and on or about June 10, 2025, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, KIMERIDZE violated 18 U.S.C. § 1956(h), that is, did conspire or attempt to conspire with one or more persons to knowingly conduct financial transactions affecting interstate and foreign commerce, which financial transactions involved the proceeds of specified unlawful activity, knowing the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). There further is probable cause to believe that the specified unlawful activity is health care fraud, in violation of 18 U.S.C. § 1347, and wire fraud, in violation of 18 U.S.C. § 1343.

4.      The information and statements contained in this affidavit are based upon my personal knowledge and investigation, as well as documents and information provided to me by other law enforcement personnel and witnesses. Since this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation. All figures, times, and calculations set forth in this affidavit are approximate.

## PROBABLE CAUSE

5.      The government's investigation has revealed that KIMERIDZE facilitated the operation of two purported durable medical equipment ("DME") companies, Main Street DME, Inc. ("MAIN STREET"), and ABRH Care Inc. ("ABRH"), that fraudulently billed Medicare, Medicare Supplemental Insurers ("Medigap"), Medicare Advantage Organizations ("MAOs"),

2

and the Federal Employees Health Benefits Program ("FEHBP") more than $1 billion for urinary catheters, orthotic braces, and wound dressings that beneficiaries did not need and did not receive.[1] In particular, KIMERIDZE engaged directly with health care fraud and wire fraud proceeds obtained by MAIN STREET in the course of the fraudulent scheme, and transmitted those proceeds to co-conspirators who ultimately laundered the proceeds out of the United States by wire transfers to shell entities overseas. After being alerted by law enforcement that he was transacting in fraud proceeds, KIMERIDZE both continued to work at MAIN STREET and became involved with ABRH, a second fraudulent DME company involved in the same scheme. KIMERIDZE's involvement not only continued after being informed he was participating in a criminal scheme, it evolved: rather than personally laundering the health care fraud and wire fraud proceeds obtained by ABRH, KIMERIDZE directed ABRH's nominee owner, Irakli Nakashidze ("NAKASHIDZE"), in the laundering of funds.

---

[1] DME is equipment that is designed for repeated use and for a medical purpose, such as orthotic braces and continuous glucose monitors. Wound dressings include alginate dressings intended to absorb exudate from wounds and promote tissue regeneration.

3

*Commercial Insurance*

6. Private insurers offer various individual and family insurance plans that cover medical costs such as DME and wound dressings in accordance with their policies and state and federal law, including requirements that such services be medically necessary.

*The Medicare Program*

7. The Medicare Program ("Medicare") is a federally funded health care program that provides free or below-cost health care benefits to individuals who are sixty-five years of age or older or disabled. The benefits available under Medicare are governed by federal statutes and regulations. The United States Department of Health and Human Services, through its agency, the Center for Medicare and Medicaid Services ("CMS"), oversees and administers Medicare. Individuals who receive benefits under Medicare are commonly referred to as "beneficiaries."

8. Medicare is subdivided into multiple program "parts." Medicare Part A covers health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covers physician services and outpatient care, including an individual's access to DME and wound dressings. Medicare Part C provides beneficiaries with the option to receive their Medicare Part A and B benefits through MAOs. Health care providers that provide and supply items and services to beneficiaries, whether under Medicare Part A, B, or C, are referred to as "providers."

9. To participate in Medicare parts A and B, providers, including DME companies, are required to submit an enrollment application. As set out in the application, every provider is required to meet certain standards to obtain and retain billing privileges to Medicare, including: (1) provide complete and accurate information on the application, with any changes to the information on the application reported within 30 days; (2) disclose persons and/or organizations

4

with ownership interests or managing control; (3) abide by applicable Medicare laws, regulations, and program instructions; (4) acknowledge that the payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (5) refrain from knowingly presenting or causing to present a false or fraudulent claim for payment by Medicare.

10. Upon a change in ownership to an enrolled Medicare provider, the provider is required to re-submit an enrollment application setting forth details of the new ownership, including the names of all owners and managing employees, contact information, and a certification by any new individuals that they will abide by Medicare rules and regulations.

11. Medigap helps fill "gaps" of Medicare coverage and is sold by private health insurance companies. A Medigap plan can help pay some of the remaining health care costs not covered by Medicare, such as copayments, coinsurance, and deductibles. For DME claims, a Medigap plan generally covers approximately 20% of the claim amount. Medigap insurers are contractually obligated to reimburse claims that are processed by Medicare, even if Medicare has subsequently suspended payment of the claims.

12. MAOs are private health insurance companies that contract with CMS to provide managed care to Medicare beneficiaries. Under Medicare Part C, MAOs are required to provide Medicare beneficiaries with the same services and supplies offered under other Medicare plans.

13. A provider need not be enrolled with Medicare to submit claims to MAOs for services provided to Medicare beneficiaries and, if not enrolled, is considered a non-participating provider. Such a provider does not have to enroll with or enter an agreement with an MAO to bill that MAO. An unenrolled provider is treated as an out-of-network provider and does not have to disclose corporate information such as ownership information or banking information. In my

5

training and experience, I am aware that some individuals committing healthcare fraud will avoid registering with Medicare Parts A and/or B due to the many disclosures necessary to enroll as a provider and bill those program parts.

14. To be eligible for Medicare reimbursement (whether under Medicare Part B, Part C, or Medigap), DME and wound dressings are required to be reasonable and medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, ordered by a medical professional, properly documented, and provided as represented.

### The Federal Employees Health Benefits Program

15. The FEHBP is a federally funded health benefit program for federal employees, retirees, and their eligible spouses and dependent children. OPM administers the FEHBP and contracts with numerous health insurance plans that process and pay health care claims on behalf of the FEHBP. OPM reimburses the contracted health insurance plans for 100% of the health care claims they pay, and 100% of their administrative expenses, plus a negotiated service charge.

16. The FEHBP covers DME that is medically necessary and provided as represented.

17. Medicare, Medicare Part C, Medigap, the FEHBP, and commercial insurance are "health care benefit programs" as defined by 18 U.S.C. § 24(b).

### The Defendant and Relevant Entities

18. KIMERIDZE, a Georgian national, was at certain times an employee of MAIN STREET. KIMERIDZE was arrested on April 24, 2026, in Broward County, Florida, on state larceny charges, and was detained by the Department of Homeland Security ("DHS") following his release on bond. KIMERIDZE is currently in the custody of DHS in the Southern District of Florida.

6

19. ABRH, formed in or around December 2024, and located in Miami, Florida, operated as a DME provider not enrolled in Medicare.

20. MAIN STREET, formed in or around August 2023, and located in Kennesaw, Georgia, operated as a DME provider and was approved by Medicare to supply medically necessary DME to beneficiaries.

21. NAKASHIDZE, a Georgian national, was a resident of Miami-Dade County, Florida, and the president and sole director of ABRH, between in or around January 2025 and his arrest on June 10, 2025. *See United States v. Irakli Nakashidze*, No. 1:25-cr-20452-JEM (S.D. Fla.). On November 7, 2025, NAKASHIDZE pleaded guilty to an information charging him with conspiracy to commit money laundering through ABRH. *Id.*, ECF No. 38. On May 22, 2026, NAKASHIDZE was sentenced to 37 months imprisonment. *Id.*, ECF No. 95.

22. Jason Onoufrienko ("ONOUFRIENKO"), a dual United States citizen and Russian citizen, controlled MAIN STREET at certain times while residing in Broward County, Florida. Law enforcement believes that ONOUFRIENKO left the United States, via the land border with Mexico, as of at least April 2024, and is now located in Russia. On June 18, 2025, ONOUFRIENKO was indicted in the Eastern District of New York in connection with his role in the health care fraud and money laundering conspiracy described in this complaint, and a warrant was issued for his arrest. *See United States v. Imam Nakhmatullaev, et al.*, No. 25-CR-203-RPK (S.D.N.Y.). ONOUFRIENKO remains at large.

### The Fraudulent Scheme

23. KIMERIDZE, NAKASHIDZE, and ONOUFRIENKO were each participants in a multi-billion-dollar health care fraud and money laundering scheme targeting Medicare, Medigap, MAOs, and other insurers. This scheme was orchestrated by transnational criminal organization

7

(the "Organization") based in Russia and elsewhere, which purchased or created dozens of DME companies across the United States. The Organization acquired control of these companies, installed foreign nationals and others as nominee owners of the companies, and rapidly submitted billions of dollars in false and fraudulent claims for reimbursement in the names of the involved companies. After insurers issued payments to the involved companies on these false and fraudulent claims, the Organization—through the nominee owners and others—deposited those payments into the companies' corporate bank accounts before laundering them out of the country to foreign shell corporations located in Hong Kong and elsewhere.

### MAIN STREET

A.      *Evidence of Health Care Fraud and Wire Fraud*

24.     On or about November 27, 2023, MAIN STREET was sold by its prior owner.  An Interim Report of Changes to MAIN STREET's corporate records with the Georgia Secretary of State listed ONOUFRIENKO as CEO, CFO, and Secretary.

25.     Shortly 'after ONOUFRIENKO became principal of MAIN STREET, Medicare records show that MAIN STREET began submitting claims for DME in a significant and unusual manner. From approximately January through April 4, 2024, MAIN STREET submitted claims totaling approximately $891,535,520 to Medicare for urinary catheters.  This represented a large spike in the company's billing compared to its historical business.  Nearly all of these Medicare claims were held in suspense and not paid. However, Medigap insurers continued to pay MAIN STREET for claims processed as paid by Medicare and paid MAIN STREET over $1 million on those claims.

26.     An analysis of MAIN STREET's Medicare billing records revealed a high number of claims filed for beneficiaries who had been deceased for 30 or more days.  For example, between

8

January 16, 2024, and April 4, 2024, claims were filed by MAIN STREET for approximately 2,021 beneficiaries who were deceased for 30 or more days. Based on my training and experience, Medicare providers who repeatedly bill for items or services purportedly provided to dead beneficiaries are often using Medicare beneficiary information that has been purchased or unlawfully transferred, rather than collected in the ordinary course of their provision of bona fide medical services to beneficiaries.   As such, repeated billing of items or services to dead beneficiaries is an indicator that the entity is engaged in fraudulent billing for items or services that are not medically necessary and/or not actually provided.

27.   Medicare also received telephone calls from beneficiaries to Medicare's complaint hotline, 1-800-MEDICARE, about MAIN STREET.  The hotline receives calls from the public regarding any Medicare-related issue, including fraud, waste, abuse, or quality of care issues. Investigators have determined that MAIN STREET was the subject of an unusually high number of complaints filed with Medicare and its contractor's complaint hotlines alleging that beneficiaries were billed for items or services they did not receive. Between January 19, 2024, and April 15, 2024, Medicare received approximately 18,176 beneficiary complaints listing MAIN STREET as the subject of the complaint.

28.   Investigators interviewed two Medicare beneficiaries who allegedly received urinary catheters from MAIN STREET, as well as one provider who allegedly prescribed catheters to those beneficiaries.  Both beneficiaries interviewed denied receiving any catheters from MAIN STREET.  The referring provider interviewed denied prescribing and/or ordering catheters and additionally denied that any of the identified individuals were patients of his/her practice.

9

B.      *KIMERIDZE'S Involvement with MAIN STREET*

29.     On April 15, 2024, investigators conducted surveillance of MAIN STREET in Kennesaw, Georgia.  When investigators arrived at the store front, KIMERIDZE was inside the suite and allowed investigators to enter.  The suite contained one desk, a printer/scanner, office chair, filing cabinets, and a monitor.  The suite did not contain any DME.  However, investigators did identify thousands of unopened mail envelopes from medical insurance companies, and checks and letters from medical insurance carriers.  Below are pictures captured of the office where KIMERIDZE was working:



30.     Investigators interviewed KIMERIDZE, who stated he began working as the manager of MAIN STREET, in the Kennesaw office, on or about April 11, 2024.  KIMERIDZE was contacted by an unknown individual via Telegram, an encrypted messaging platform, and hired after he learned of the job opportunity from a friend in New Jersey.  KIMERIDZE received

10

all instructions through Telegram messages on his cell phone or phone calls through a group chat titled "Gigi Work." He was instructed to open mail received at MAIN STREET, sort it, take pictures of mailed checks, send a message containing the pictures to the Telegram group chat, and count how many pieces of mail he processed. KIMERIDZE was directed by unknown individuals via Telegram to send the checks using Federal Express to various recipients, including recipients in Brooklyn, NY. The checks were issued by health insurance companies and were made out to MAIN STREET, representing the proceeds of the health care fraud scheme described above.

31. KIMERIDZE consented to allow investigators to observe his electronic communications on his Telegram account through his cell phone. In the Telegram group chat, investigators observed photos of checks issued to MAIN STREET by health insurers and mailing instructions provided to KIMERIDZE.

32. KIMERIDZE also consented to allow investigators access to his hotel room, where he had stored certain checks made out to MAIN STREET in the hotel safe. KIMERIDZE permitted investigators to photograph the checks, which investigators then returned to his possession.

33. During their conversations with KIMERIDZE on April 15, 2024, investigators informed KIMERIDZE that MAIN STREET was being used to perpetrate a multi-million-dollar criminal fraud scheme. KIMERIDZE expressed his understanding and stated that he would no longer participate in the scheme.

34. On May 1, 2024, investigators conducted additional surveillance at MAIN STREET in Kennesaw, Georgia and observed KIMERIDZE at the location once again. Below is a photograph of KIMERIDZE on that day.

11



35.     Investigators re-interviewed KIMERIDZE by phone on the same day that he was observed at the DME company. Despite being surveilled at MAIN STREET, KIMERIDZE denied having had any further contact with any of the individuals involved with MAIN STREET since his prior interaction with law enforcement.   KIMERIDZE denied receiving any additional messages through Telegram or any other messaging application.   KIMERIDZE informed investigators that because of his prior interaction with law enforcement, he would not have continued to be involved with the individuals associated with MAIN STREET.

C.     *Evidence of Money Laundering*

36.     A review of MAIN STREET's financial records did not reveal financial activity consistent with the running of a large-scale DME business.  For example, a detailed review was unable to identify a large and consistent stream of expenses tied to business activities typically expected with the operation of a DME business, such as purchases of DME, shipping, and packaging fees, and/or storage fees.

37.     On April 15, 2024, investigators interviewed the former owner of MAIN STREET, who advised that s/he never met ONOUFRIENKO in connection with the sale of the business to ONOUFRIENKO.  The former owner stated that following the sale, agents of the purchaser required him/her to add ONOUFRIENKO as a signor on MAIN STREET's bank account ending in x5533 at Financial Institution 1 ("Account 1") and to direct that any Medicare electronic funds transfers be processed into that account.

38.     Shortly after ONOUFRIENKO's acquisition of the account, in January 2024, large numbers of paper checks from health insurers began being deposited into the account. In total, between January 1, 2024, and May 31, 2024, at least $5 million in health care fraud proceeds were deposited into Account 1.[2] These deposits represent more than 99% of the total deposits into Account 1.

39.     These deposits occurred in various locations, including in Broward County, Florida, and in Brooklyn, New York, where KIMERIDZE told investigators he had been instructed to mail checks.  For example, funds from health insurers were deposited into Account 1 on April 3, April 8, April 9, April 16, and April 17, 2024, in Brooklyn, New York. Deposits of checks from health insurers into Account 1 continued until at least July 17, 2024.[3]

40.     Deposit records for Account 1 show that multiple checks issued to MAIN STREET by Blue Cross and Blue Shield of Illinois were deposited into the account on April 19, 2024.

---

[2] These deposits were in the form of paper checks from health insurers or cashier's check and wire deposits from other MAIN STREET accounts. Investigators have traced the source of the funds deposited from other MAIN STREET accounts and have determined that they were likewise funded almost exclusively by health care fraud proceeds.

[3] Financial Institution 1 did not provide location information for these later deposits.

Multiple checks that appear to be issued by Blue Cross and Blue Shield of Illinois based on the iconography and signatures were also visible in KIMERIDZE's Telegram chat, recorded by investigators on April 15, 2024. The Telegram chat further showed that KIMERIDZE was directed by his co-conspirators to mail the checks to Brooklyn, New York "overnight expedited."

41.   Financial records from Account 1 show that after being deposited into Account 1, funds from health insurers were rapidly wired out of the account to three different shell corporations. In total, between January 1, 2024, and May 31, 2024, approximately $3.4 million in health care fraud proceeds were wired out of Account 1 to shell corporations: approximately $2,742,792 to Entity 1, $522,344 to Entity 2, and $142,179 to Entity 3. From there, financial records show that the majority of the funds were wired to a second layer of shell corporations located outside the United States.

### *ABRH*

A.   *Evidence of Health Care Fraud and Wire Fraud*

42.   In or around December 2024, ABRH was formed with the Florida Secretary of State. On or about January 10, 2025, Articles of Amendment were filed with the Florida Secretary of State listing NAKASHIDZE as the sole director of ABRH. On or about January 21, 2025, NAKASHIDZE signed and notarized a stock purchase agreement purchasing ABRH from its prior owner.

43.   Shortly after NAKASHIDZE became principal of ABRH, ABRH began submitting claims for DME in a significant and unusual manner. From approximately February through May 19, 2025, ABRH submitted claims totaling at least approximately $179,232,374 to MAOs, private insurers, and the FEHBP, for orthotic braces and wound dressings.  As ABRH had

14

previously submitted no claims to insurers for any kind of equipment, this represented a large spike in its billing. In total, insurers paid at least approximately $3,901,244 to ABRH for these claims.

44.     An analysis of ABRH's billing records revealed unusual billing patterns indicative of fraud.   For example, data received from Insurer 1 shows that ABRH filed claims for approximately 4,207 beneficiaries between April 23, 2025, and May 20, 2025, at least approximately 3,536 of whom were billed for at least five different products. These products included either multiple orthotic braces—often for the back, both wrists and both knees—or a combination of orthotic braces and wound dressings. Based on my training and experience, providers who repeatedly bill for the same combination of items or services, or for items or services that could not practicably be provided to a given beneficiary, are not engaged in the provision of bona fide medical services to beneficiaries. As such, repeated billing of this type is an indicator that the entity is engaged in fraudulent billing for items or services that are not medically necessary and/or not actually provided.

45.     Investigators interviewed five beneficiaries who allegedly received wound dressings or orthotic braces from ABRH. Each beneficiary interviewed was billed by ABRH for implausible quantities of wound dressings, or implausible combinations of orthotic braces. For example, the three beneficiaries who were billed for wound dressings received at least 240 units of wound dressings, and the three beneficiaries who were billed for orthotic braces received a left-side wrist brace, a right-side wrist brace, a left-side knee brace, a right-side knee brace, and a rigid

15

back brace.[4] All five beneficiaries interviewed denied receiving any equipment or wound dressings from ABRH.

46.    Investigators also interviewed three providers who allegedly prescribed wound dressings or orthotic braces to thirteen Medicare Part C beneficiaries. Each provider interviewed denied prescribing and/or ordering wound dressings or orthotic braces from ABRH and additionally denied that any of the identified beneficiaries were patients of their practices.

B.    *Evidence of Money Laundering*

47.    In and around January and February 2025, NAKASHIDZE opened accounts for ABRH with at least nine different banks.

48.    A review of ABRH's financial records did not reveal financial activity consistent with the running of a large-scale DME business.  For example, a detailed review was unable to identify a large and consistent stream of expenses tied to business activities typically expected with the operation of a DME business, such as purchases of DME, shipping, and packaging fees, and/or storage fees.

49.    Shortly after NAKASHIDZE opened the ABRH bank accounts, large numbers of paper checks from health insurers began being deposited into the accounts. In total, between January 10, 2025, and June 10, 2025, at least approximately $2.1 million in health care fraud proceeds were deposited into the ABRH bank accounts. At least approximately $1.1 million was quickly transferred out of the accounts to shell companies located abroad.

---

[4] One beneficiary was billed for 240 units of wound dressings, left- and right-side wrist braces, left- and right-side knee braces, and a back brace.

16

50.     Like MAIN STREET, ABRH's corporate office contained no DME—just laptops, printers, and hundreds of checks and letters from medical insurance carriers.

51.     On June 10, 2025, NAKASHIDZE was arrested pursuant to a complaint charging him with money laundering for transferring health care fraud proceeds out of ABRH's corporate accounts to shell companies located abroad. *United States v. Nakashidze*, No. 1:25-cr-20452-JEM (S.D. Fla.), ECF No. 3. On November 7, 2025, NAKASHIDZE pleaded guilty to an information charging him with conspiracy to commit money laundering through ABRH. *Id.*, ECF No. 38. On May 22, 2026, NAKASHIDZE was sentenced to 37 months imprisonment. *Id.*, ECF No. 95.

C. *KIMERIDZE'S Involvement with ABRH*

52.     On May 13, 2026, investigators interviewed NAKASHIDZE. NAKASHIDZE told investigators that he had been recruited to operate ABRH in or around December 2024—eight months after investigators informed KIMERIDZE that he was participating in a criminal fraud scheme, and after KIMERIDZE communicated his understanding to investigators. NAKASHIDZE stated that his participation in the scheme was coordinated primarily through Telegram; in particular, through group chat titled "Irakli ABRH Work."

53.     NAKASHIDZE informed investigators that after being recruited into the scheme, he was directed by his co-conspirators in or around January 2025 to move to Miami, execute purchase documents for ABRH, and join the "Irakli ABRH Work" group chat. NAKASHIDZE told investigators that the purpose of the Telegram chat was to provide NAKASHIDZE with instructions on the operation of ABRH and its corporate bank accounts. NAKASHIDZE stated that this group chat included KIMERIDZE, as well as other co-conspirators. NAKASHIDZE positively identified KIMERIDZE when shown a photograph by investigators. NAKASHIDZE could not recall the alias used by KIMERIDZE in the Telegram group chat.

17

54.     Investigators searched a cell phone seized from NAKASHIDZE's person during his arrest, and identified the Telegram chat described by NAKASHIDZE, titled "Irakli ABRH Work." Screenshots of this chat stored on the cell phone show that it was used to direct NAKASHIDZE's laundering of fraud proceeds using the ABRH corporate bank accounts.

55.     On NAKASHIDZE's cell phone, investigators also identified Telegram chat records between NAKASHIDZE and an individual using the name "Gigi." Records show that NAKASHIDZE and the individual known as Gigi begin communicating over Telegram on or about January 25, 2025, four days after NAKASHIDZE finalized his purchase of ABRH, and remained in regular communication until on or about June 2, 2025, shortly before NAKASHIDZE's arrest.

56.     Investigators are aware that KIMERIDZE uses the name "Gigi." KIMERIDZE previously identified himself to investigators using that name, and the Telegram chat in which he received instructions relating to MAIN STREET was titled "Gigi Work." KIMERIDZE's United States cell phone number is also saved in NAKASHIDZE's phone as "Gigi Los Angeles."[5]

57.     Chat records between NAKASHIDZE and the individual known as Gigi contain communications relating to NAKASHIDZE's participation in the fraudulent scheme. For example, chat records show that on or about February 7, 2025, NAKASHIDZE confirmed to Gigi that eight accounts have been opened. This number comports with investigators' understanding of the number of accounts NAKASHIDZE had opened for ABRH as of February 7, 2025. Gigi responded to this information with a thumbs up emoji.

---

[5] Telegram does not associate individual accounts with cell phone numbers and instead assigns new identifiers to Telegram users.

18

58. NAKASHIDZE informed investigators that upon moving to Miami, he was directed by his co-conspirators to obtain an apartment, and that KIMERIDZE provided him with money to rent the apartment. Chat records between NAKASHIDZE and the individual known as Gigi show that on or about February 12, 2025, Gigi requested NAKASHIDZE's CashApp username to send NAKASHIDZE money. NAKASHIDZE provided his CashApp username and routing number, and confirmed receipt of $1,000. Review of bank records for accounts held in NAKASHIDZE's name show that on that same day, NAKASHIDZE received a CashApp transfer of approximately $982.50. This exchange took place shortly after NAKASHIDZE moved to Miami in January 2025.

59. NAKASHIDZE stated that KIMERIDZE and his associates controlled him during his operation of ABRH and the ABRH corporate bank accounts. NAKASHIDZE further stated that KIMERIDZE instructed him to transfer money to KIMERIDZE, or to associates of KIMERIDZE, on numerous occasions in the course of his operation of ABRH.

60. Financial records for accounts held by NAKASHIDZE and ABRH show numerous peer-to-peer transfers to and from unknown third parties during NAKASHIDZE's operation of ABRH. Financial records also show at least approximately $135,000 in wire transfers to Entity 1, a privately held company. Financial records for an account held by Entity 1 show that between July 1, 2024—shortly after KIMERIDZE's involvement with MAIN STREET—and July 31, 2025—shortly after NAKASHIDZE's arrest for his involvement with ABRH—there were approximately 48 Zelle transfers between Entity 1 and "Giorgi Kimeridze" or "Gigi Los Angeles."

61. NAKASHIDZE's interactions with KIMERIDZE took place at least eight months after investigators informed KIMERIDZE he was participating in a criminal fraud scheme.

19

## CONCLUSION

62.     Based on the facts set forth above, I respectfully submit that probable cause exists

to believe that, between on or about April 11, 2024, and on or about June 10, 2025, in the Southern

District of Florida and elsewhere, KIMERIDZE did conspire or attempt to conspire to commit

money laundering, in violation of 18 U.S.C. § 1956(h).


Respectfully submitted,

Robert Lepley  Badge #A1585
Special Agent
HHS-OIG


Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by:
Telephone
(specify reliable electronic means).

Date: June 22, 2026

HONORABLE ENJOLIQUÉ A. LETT
UNITED STATES MAGISTRATE JUDGE

20